UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PEGGY C. COLLINS,                    )
            Plaintiff,               )
                                     )
    vs.                              )          1:07-cv-1078-LJM-TAB
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of the Social Security Administration, )
            Defendant.               )


## ENTRY ON JUDICIAL REVIEW

Plaintiff, Peggy C. Collins ("Collins"), requests judicial review of a final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), which found that Collins was not entitled to a period of disability, Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI"). The Court rules as follows.


## I.  BACKGROUND

Collins was born on March 2, 1962. R. at 67.  The date of her alleged onset of disability was July 1, 2002. R. at 12.  Administrative Law Judge ("the ALJ") James R. Norris issued his decision on February 5, 2007 after a hearing on August 25, 2006. R. at 12, 23.  Collins has graduated from high school and was forty-four years old at the time of the ALJ's decision. R. at 561. She also had past relevant work experience as a transportation driver. R. at 621.

Collins is an obese diabetic who has complained of pain in her knees since 1998. R. at 173-180. On July 5, 2002, she was referred to Darryl Tannenbaum, M.D. ("Dr. Tannenbaum"), for

1

knee pain by her family physician, Dr. Byrd.  R. at 173.  Dr. Tannenbaum diagnosed Collins with right knee patellofemoral chondromalacia and treated her with Cortisone injections.  R. at 173.  On July 11, 2002 Dr. Byrd, Collins' family physician, filled out an Indiana State Determination of Disability form in which he stated that she had limitations on standing and walking but no limitations on sitting and was not precluded from all employment.  R. at 340-41.  On August 2, 2002, Dr. Tannenbaum recommended that she have an MRI, and on August 13, 2002, he determined that the MRI was consistent with chondromalacia of the patella and degenerative joint disease.  R. at 171-72.

On February 21, 2003, Collins saw Dr. Mason, another family physician, with a complaint of cracking in her right knee.  R. at 362.  Dr. Mason noted that her right knee was warm to the touch and exhibited mild crepitis.  R. at 362.  Collins experienced lateral joint tenderness during extension and "considerable pain" when fully extending her leg.  R. at 362.  Two months later Collins saw Dr. Mason again, and she complained of left knee pain and lower leg pain resulting from her job as a waitress.  R. at 361.  Dr. Mason opined that it was likely a simple strain.  R. at 217.  He noted that there was no joint deformity or effusion, and he recommended that she continue working and walking.  R. at 361.  On August 5, 2003, Collins returned to Dr. Mason complaining of bilateral knee pain resulting from her job at McDonalds and he told her to continue taking Aleve for the pain and referred her to Dr. Olson.  R. at 360.

On August 18, 2003, Collins was having difficulty walking, and she saw Dr. Olson.  R. at 170.  He took X-rays of Collins' knees which showed laterofemoral condyle of both knees, knee joint narrowing on the medial compartment more on the right than on the left, sharpening of the tibial spines and cyst formation on the mediofemoral condyle of the left knee.  *Id.*  Dr. Olson noted that there was moderate to severe degenerative joint disease in both of Collins' knees, and it was

worse in the right knee than the left. *Id.*  A MRI of Collins' right knee showed moderate to severe degenerative joint disease with an effusion. R. at 168. Collins was given an injection in both knees and was told to take Aleve twice daily and to ice and heat her knees as needed. R. at 168. Collins received another injection on September 8, 2003. R. at 166. On September 16, 2003, Collins called Dr. Olson's office crying and told them that she almost had passed out from the pain in her knee. *Id.*  On September 22, 2003, Collins reported walking on crutches most of the time. R at 164. Collins received a third injection, and she expressed doubt regarding the efficacy of the injections. *Id.*  Dr. Olson noted that her exam showed mild synovial hypertrophy of both knees, mild diffuse tenderness, no increased redness or warmth, and no gross deformity. *Id.*  Collins was instructed to begin physical therapy. *Id.*

On September 26, 2003, Collins began physical therapy. R. at 199. She complained that her pain was severe and constant in both knees. *Id.*  She rated the pain a five to ten on a ten point scale, and told the physical therapist that she had been unable to walk without crutches for three weeks. *Id.*  At that time Collins had significant swelling along both knee joint lines and significantly increased temperature to touch in the same area. *Id.*  On October 24, 2003, Collins reported that she was feeling the best she had in "a while," that she thought therapy was helping, and she rated her average pain as a five to seven on a ten point scale. R. at 202. She reported decreased use of crutches but that "prolonged" walking was still difficult and painful and her right knee still became swollen easily. *Id.*  Upon her discharge from therapy, Collins reported that she was fairly satisfied and was able to walk without crutches even though her gait was still irregular. R at 518. The therapist noted that Collins had partially accomplished some of her short term goals but did not meet

her long term goals, and the therapist hoped that Collins would continue physical therapy, but Collins did not return for more sessions. *Id.*

On December 6, 2003, Collins underwent a consultative examination with Dr. Bilal Ali ("Dr. Ali"). She reported that she used a cane to walk for stability purposes and she ranked her pain as a constant eight on a ten point scale. R. at 325. She also stated that if she lifted more than five pounds her knees trouble her a great deal. *Id.* Dr. Ali noted that Collins had an extremely unsteady gait without her cane and that her gait improved when walking with the cane. R at 326. Thus, he determined that the assistive device was medically important. *Id.* Further, Collins' straight leg raising was positive at thirty degrees on the left and forty-five on the left. *Id.* Dr. Ali stated that Collins was not able to stand or walk at least two hours in an eight hour day. *Id.*

On January 2, 2004, Dr. S. Roush ("Dr. Roush"), a state agency physician, reviewed the medical evidence of record and stated that Collins could occasionally lift twenty pounds, and frequently lift ten pounds, and that she could stand or walk for at least two hours in an eight hour work day with a medically required handheld device and sit with normal breaks for a total of about six hours in an eight hour work day.  R. at 182. Dr. Roush stated that his opinion of Collins' condition did not significantly differ from that of Collins' treating physicians. R. at 187. On March 18, 2004, L. Bastnagel, M.D. ("Dr. Bastnagel"), a second state agency physician, reviewed the medical evidence of record and agreed with Dr. Roush's opinion regarding Collins' limitations. R. at 188.

On March 3, 2004, Collins underwent a medical examination for a commercial driver's license and she denied any muscular disease or chronic low back pain. R. at 419-420. Her

examination was within normal limits and she was found fit to receive a commercial driver's license. R. at 420.

Collins continued to experience knee pain and on May 17, 2004, Dr. Olson diagnosed severe degenerative joint disease in her knees, obesity and tendinitis in the right wrist. R. at 157. On June 8, 2004, Dr. Mason stated that Collins could not stand for longer than one hour daily which limited her ability to work, and two days later Dr. Olson stated that Collins needed to sit down 90% of the time and not lift anything over 5 pounds.

In September 2004, Collins was seen by Dr. Olson for an evaluation of back and shoulder pain, and he noted that there was tenderness across the lower back and posterior superior iliac spine. He noted that she was obese, continued to have severe degenerative joint disease in her knees and was experiencing chronic lower back pain. R. at 447. Collins continued to have soreness across her back and in her knees through November and X-rays of her left elbow showed no fracture, spurring or degenerative joint disease. R at 445. She thought that she had improved with physical therapy and Dr. Olson prescribed heat and ice, exercise and Aleve. *Id.*

In January 2005, Collins' tenderness in her knees continued and she had a range of motion of the knees from 0 to 110 degrees. R. at 444. On May 26, 2005, Collins reported that her back went out when getting off of a riding lawn mower, and upon examination she had a steady gait and her deep tendon reflexes were symmetric. R. at 408. Her spine was tender, but her strength was within normal limits. In August, Collins was seen for an evaluation of knee pain and she reported to Dr. Olson that the injections did not help but she did not want surgery. R. at 442. Dr. Olson noted that Collins had tenderness in both knees, her range of motion was from 0 to 125 degrees, and there was no significant varus or valgus deformity. *Id.* The following month Collins was evaluated for

5

physical therapy to treat a sprained right ankle and left plantar faciitis.  R. at 480-481.  Collins described her previous level of functioning as totally independent, including driving.  R. at 480.  In November 2005, Collins claimed to be feeling somewhat better after therapy, but she still reported the pain in her ankle as four or five out of ten and in her left ankle as a six or seven out of ten.  R at 438.  Her therapist recommended two more weeks of therapy, and two weeks later Collins cancelled her last appointment so there was no formal reevaluation.  R. at 440.

Collins' knee pain continued  through February 2006, when she described her pain as only intermittent.  R at 568.  At that appointment Dr. Olson noted that Collins had tenderness in her knees with no effusion and her straight leg raising was negative.  *Id.*

In March 2006, Collins began to notice swelling in her right wrist.  R. at 570.  She returned to Dr. Olson who noted on exam that there was mild soreness at the base of the right thumb, but that Collins had a full range of motion for the right wrist and a negative Finkelstein's test.  The diagnosis was possible synovitis right wrist.  A MRI showed evidence of tenosynovitis and degenerative changes in the right wrist.  R at 570, 573-74.  Collins' thumb pain continued through late April.  R. at 571.  When she took a part time job the pain intensified but she had no triggering and could fully extend it to a neutral position.  *Id.*  In May 2006, Collins reported that an injection had relieved the pain in her thumb but the triggering that she claimed to be experiencing had not stopped, and she experienced numbness of her little finger and ring finger for the first time.  R. at 572.  Upon examination Dr. Olson noted that she had no obvious triggering but that she had a palpable nodule on her flexor tendon sheath and that she had a full range of motion.  *Id.*  Collins' right elbow showed slight tenderness in the ulnar groove but not paresthesia.  *Id.*  Dr. Olson diagnosed her with right trigger thumb and right cubital tunnel syndrome.  *Id.*

6

On July 27, 2006, Dr. Olson stated in a residual functional capacity ("RFC") assessment that Plaintiff could sit up to one hour at a time for four hours a day, could stand one hour a day, and walk for one hour a day. R. at 584. Dr. Olson also stated that Collins could occasionally lift and carry up to ten pounds and that she had no problem with simple grasping and fine manipulation with both hands. *Id.*

At her hearing on August 25, 2006, Collins testified that she could sit for four hours a day for thirty minutes at a time and stand for ten minutes at a time. Dr. Paul Schneider ("Dr. Schneider"), a medical expert, testified at Collins' hearing that it appeared that her largest medical problem was due to degenerative joint disease in her knees. R at 614. He also testified that Dr. Olson's RFC assessment, which he interpreted as being consistent with sedentary work[1], was "reasonable based on medical evidence." *Id.*

Ray Burger ("Burger"), a vocational expert, testified at the hearing that Collins would be unable to do her past relevant work which consisted of being a transportation driver, and when questioned specifically by the ALJ, Burger agreed that there would be no job in the national economy that can be performed at the unskilled level less than eight hours a day. R. at 622.

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for SSI and DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any

---

[1] Sedentary work requires (1) lifting and carrying ten pounds occasionally; (2) sitting for six hours during an eight-hour workday; (3) standing and/or walking for two hours during the remainder of the workday; and (4) using hands and fingers to perform repetitive fine-finger manipulation. 20 CFR § 404.1567(a); Social Security Ruling 83-10.

medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423 (d)(1)(A).  In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1.    If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2.    If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3.    If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4.    If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5.    If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, then it shifts to the Commissioner at the fifth step.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. §405(g), provides for judicial review of the Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner.  *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the ALJ's findings if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ.  *Id.*  While a scintilla of evidence is insufficient to support

8

the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### III. DISCUSSION

### A. THE ALJ'S FINDINGS

At the first step of the disability analysis the ALJ found that, although Collins has worked from July, 1, 2002, her alleged onset date, she has not performed substantial gainful activity ("SGA") because she held each of the jobs for less than three months due to reasons related to her impairment or the jobs provided an income significantly below the presumptive SGA amount.  R. at 13.  At step two, the ALJ determined that Collins has "severe" impairments consisting of degenerative changes in her right ankle, heel, and both knees, plantar facitis in her right foot, medial epicondylitis affecting her left elbow, left cubital tunnel syndrome, tenosynovitis in her right wrist, and tenosynovitis in her right thumb.  *Id.*  At the third step, the ALJ determined that although Collins claims impairments affecting her wrists, left elbow, knees, and right ankle she is still able to use her upper extremities to effectively perform fine and gross movements and she can still walk effectively.  R. at 15.  Thus, her impairments do not meet or equal in severity the criteria of any impairment contained in the Listing of Impairments.  *Id.*  At step four, the ALJ determined that in light of her RFC assessments, Collins cannot perform her past relevant work, but at step five, the ALJ determined that Collins was capable of working through the relevant period if restricted to sedentary exertion, and thus she is not disabled.  R. at 15-16.

## B. COLLINS' ARGUMENT ON APPEAL

Collins' sole argument is that the ALJ erred in not assigning controlling weight to Dr. Olson's July 2006 RFC assessment which stated that Collins should not lift more than five pounds, should sit for no more than four hours in a work day and should stand or walk for no more than two hours. If Dr. Olson's opinion had been considered controlling then Collins would be unable to meet the above noted requirements for sedentary work, which would result in a ruling in her favor. Specifically, Collins argues that the record substantially supports Dr. Olson's RFC assessment, and for that reason it must be accorded "great" weight by the ALJ. Collins cites *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995), for the proposition that "the ALJ must give substantial weight to the medical evidence and opinions submitted, unless specific legitimate reasons constituting good cause are shown for rejecting it." This "treating physician rule" has been codified in the social security regulations ("SSRs"). The regulation states:

> Generally we give more weight to opinions from . . . treating sources . . . . If we find that your treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d). In support of the assertion that Dr. Olson's RFC assessment is well supported by "medically acceptable clinical and laboratory techniques," Collins refers to a 2003 MRI that showed moderate to severe degenerative joint disease with an effusion and X-rays taken in 2003 that showed "spurring along the laterofemoral condyle of both knees, knee joint narrowing on the medial compartment more on the right than the left, shapening of the tibial spines and cyst formation on the mediofemoral condyle of the left knee." R. at 455. Collins also points out that the medical expert, Dr. Schneider, agreed at the hearing that she had severe impairments. R. at 611. Thus,

10

because of the alleged support in the record for Dr. Olson's conclusions in his 2006 RFC assessment Collins argues that it should have been adopted by the ALJ.

However, the ALJ could have reasonably accepted as adequate other evidence in the record to determine that Dr. Olson's July 2006 assessment was not well supported by the medical evidence making it "simply not credible" and thus not controlling.   Most persuasive are the internal contradictions in Dr. Olson's medical opinions.  The ALJ pointed to the fact that only two years earlier, in June of 2004, Dr. Olson opined that Collins could not lift over five pounds and needed to sit "90%" of the time.  But, with no significant changes in her clinical signs by July 2006, Dr. Olson shifted his opinion to what was contained in his July 2006 RFC assessment.  Additionally, the 2003 MRI cited by Collins in support of Olson's RFC assessment, pre-dates Olson's opinion that Collins needed to sit 90% of the time and provides no explanation for why Collins needed to limit her sitting to only four hours a day.  Further, Dr. Olson stated only two months later that Collins could lift up to ten pounds which again contradicted, with no change in Collins' clinical signs, his July 2006 RFC assessment.

Not only are Dr. Olson's medical observations and statements internally contradictory, but there is other evidence in the record that the ALJ could reasonably believe contradicted Dr. Olson's July 2006 RFC assessment.  Collins was able to successfully pass a medical examination for a commercial driver's license in 2004 in which she denied any muscular disease and her physical examination was completely within normal limits.  The 2003 MRI cited by Collins in support of Dr. Olson's 2006 opinion predates this exam.   If the MRI was truly supportive of Dr. Olson's 2006 opinion there should have been some clinical findings in this physical exam that supported the MRI and corroborated of Dr. Olson's 2006 RFC assessment, but there were  not.  Further, Collins was

11

able to take part in daily activities including riding a lawn mower in 2005, and by February of 2006 she described her knee pain as only intermittent and she was able to treat it with over-the-counter medications. Additionally, when Collins applied for disability she claimed no problems in sitting and, in fact, stated specifically that she had to sit in order to do her laundry.

The ALJ could also reasonably conclude that other medical opinions in the record contradicted Dr. Olson's assessment. Both Dr. Byrd and Dr. Mason treated Collins and found that she could perform a sit down job. Dr. Byrd specifically stated that Collins had a limitation on walking and standing but could perform unlimited sitting, and, in the time between his opinion and Dr. Olson's, there was no change in the objective medical record that would support Dr. Olson's different conclusion. Further, the ALJ considered the state agency physicians' opinions that found Collins could perform sedentary and light work in 2004, two years after Collins' alleged onset date and one year after the MRI that Collins' relies on to support Dr. Olson's contradictory opinion. Finally, the ALJ also reasonably considered the testimony of Dr. Schneider at the hearing who the ALJ understood to endorse the argument that Collins was limited to sedentary work but did not specifically accept Dr. Olson's suggested limitations of sitting for only four hours a day.

The evidence above shows that the ALJ reasonably found that Dr. Olson's opinion was not supported by acceptable medical evidence and thus was not entitled to controlling weight. Considering all of the evidence, the ALJ's determination that Collins could perform sedentary work despite her impairments and thus was not impaired was reasonable.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the final decision of the Commissioner of Social Security in this case is **AFFIRMED**.  Final judgment shall be entered accordingly.

IT IS SO ORDERED this 22nd day of May, 2008.

LARRY J. McKINNEY, JUDGE<br>
United States District Court<br>
Southern District of Indiana

Electronically distributed to:

William Edward Jenner
JENNER AUXIER & PATTISON LLP
wjenner@wjennerlaw.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov